Affirmed and Memorandum Opinion filed August 16, 2011.

In The

 

Fourteenth Court of
Appeals

                                                                                          



NO. 14-10-00845-CR



 

DANNY RAY WHITFIELD, Appellant

V.

THE STATE OF TEXAS, Appellee

 



On Appeal from the 351st
District Court

Harris County, Texas

Trial Court Cause No. 1221659



 

MEMORANDUM OPINION

             A
jury convicted appellant, Danny Ray Whitfield, of aggravated robbery with a
deadly weapon and assessed punishment at ten years’ confinement.  In four
issues, appellant contends the evidence is legally and factually insufficient
to support the conviction and he received ineffective assistance of counsel. 
We affirm.

I.  Background

            The complainant,
Leonard Gunderson, testified as follows regarding the incident at issue.  At
approximately 11:30 p.m. on May 28, 2009, he shopped at a Walgreens store in
Houston.  While he was inside the store, a man made a passing comment about some
merchandise.  After Gunderson exited the store and unlocked his truck, the same
man approached.  Gunderson first ignored the man, believing he would ask for
money, and turned to enter his truck.  However, the man then grabbed Gunderson
from behind and pulled him between his truck and another vehicle.  As they
wrestled, Gunderson was knocked to the pavement.  Gunderson screamed and kicked
the man, attempting to repel him.  The man retrieved a small “semi-automatic” gun,
aimed it at Gunderson, and threatened to shoot if he did not “shut up.”  Another
man exited the adjacent vehicle and removed Gunderson’s wallet from his
pocket.  The men then fled in their vehicle.  Gunderson described the suspects
to Officer Nathaniel Alvarez, who responded immediately after the incident.

            Gunderson
further testified that he met with Officer Paul Reese of the Houston Police
Department’s robbery division about a week after the incident.  Officer Reese
showed Gunderson seven still photos obtained from the store’s surveillance
video.  Gunderson also viewed the surveillance video earlier on the day that he
provided his trial testimony.  At trial, Gunderson identified appellant as the
person whom he saw inside the store, the person who robbed him, and the person
depicted in the surveillance photos and on the video.  Gunderson further
testified that, about a month after the robbery, Officer Reese showed him six
additional photos and asked if the robber was depicted in any of them.  At that
time, Gunderson identified one such photo as depicting the robber. 

            Officer
Alvarez testified that Gunderson was “rattled, nervous, shaken up . . . breathing
pretty heavily . . . pacing . . . very scared, very nervous” when Officer
Alvarez arrived at the scene although Gunderson eventually calmed down. 
Gunderson reported an aggravated robbery by two suspects, including a black
male wearing a blue shirt and light-colored pants.

Another
witness, Yolanda Hampton, testified that she shopped at the store sometime
after 11:00 p.m. on the evening of the incident.  After driving out of the
parking lot, she noticed a black man and an Hispanic man struggling with a
white man between two vehicles.  She had seen the black man and the white man
in the store.  Hampton reentered the parking lot and honked because all
participants were on the ground and the “two guys” were “just all over the
man.”  She followed the assailants as they fled and attempted to obtain a
license number but eventually abandoned her pursuit.  Although Hampton did not
identify appellant at trial, she described the black assailant as wearing a
blue shirt and khaki pants.

The
State also presented testimony from Officer Reese.  According to Officer Reese,
several days after the incident, he interviewed Gunderson and viewed the
store’s surveillance video.  Officer Reese developed a suspect because the
video showed a person “casing” Gunderson.  A few days later, Officer Reese
showed still photos obtained from the video to Gunderson, who confirmed that
the person depicted therein was the robber.  At Officer Reese’s request, a
local television station aired some footage from the video.  Via two anonymous
callers to Crime Stoppers, Officer Reese discovered appellant’s name and
address.  Officer Reese then acquired another photo of appellant which he
included in a photo array of six African-American males of similar size, hair
color, and facial hair.  Officer Reese showed Gunderson the array, explaining
the robber may or may not have been included.  Gunderson identified appellant
as the robber and became nervous when he saw appellant’s photo.  Appellant was
arrested shortly thereafter.  At trial, Officer Reese identified appellant as
the person whom Gunderson identified in the photo array.

II.  Sufficiency of the Evidence

In his first
and second issues, appellant contends the evidence is legally and factually
insufficient to support the verdict.  While this appeal was pending, five
judges on the Texas Court of Criminal Appeals held that only one standard
should be employed to evaluate whether the evidence is sufficient to support a
criminal conviction beyond a reasonable doubt: legal sufficiency.  See Brooks v. State, 323 S.W.3d 893, 894–95 (Tex. Crim. App.
2010) (plurality op.); id. at 926 (Cochran, J., concurring).
 Accordingly, we review appellant’s challenge to factual sufficiency of
the evidence under the legal-sufficiency standard.  See Pomier v. State,
326 S.W.3d 373, 378 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (applying
single standard of review required by Brooks); see also Caddell v.
State, 123 S.W.3d 722, 726–27 (Tex. App.—Houston [14th Dist.] 2003, pet.
ref’d) (explaining that this court is bound to follow its own precedent).

When
reviewing sufficiency of the evidence, we view all of the evidence in the light
most favorable to the verdict to determine whether the jury was rationally
justified in finding guilt beyond a reasonable doubt.  Brooks, 323
S.W.3d at 899 (plurality op.).  We may not sit as a thirteenth juror and
substitute our judgment for that of the fact finder by reevaluating the weight
and credibility of the evidence.  Id. at 899, 901; Dewberry v. State,
4 S.W.3d 735, 740 (Tex. Crim. App. 1999); see also Sharp v. State, 707
S.W.2d 611, 614 (Tex. Crim. App. 1986) (expressing that jury may choose to
believe or disbelieve any portion of the testimony).  We defer to the fact
finder’s resolution of conflicting evidence unless the resolution is not
rational.  See Clayton v. State, 235 S.W.3d 772,
778 (Tex. Crim. App. 2007).  Our duty as reviewing court is to ensure the
evidence presented actually supports a conclusion that the defendant committed
the crime. Williams v. State, 235 S.W.3d 742, 750 (Tex. Crim. App.
2007).

A person
commits aggravated robbery “if, in the course of committing theft and with
intent to obtain or maintain control of the property, he . . . intentionally or
knowingly threatens or places another in fear of imminent bodily injury or
death” and “uses or exhibits a deadly weapon.”  Tex. Penal Code Ann. §§
29.02(a)(2); 29.03(a)(2) (West 2011).  Appellant does not dispute that Gunderson
was the victim of an aggravated robbery; instead, appellant contends the
evidence was insufficient to support the finding that appellant was one of the
perpetrators.

            Appellant
contends Gunderson’s identifications of appellant in the photo array and at
trial were tainted by the fact that he had previously viewed the seven surveillance
photos.  However, at trial, Gunderson was emphatic in identifying appellant as
one of the perpetrators and was “certain” the photo he chose in the array
depicted the robber.  Gunderson testified that these identifications were based
on his recollection of the incident—not the surveillance photos.  Therefore, Gunderson’s
earlier viewing of the surveillance photos was merely a factor the jury was
free to consider when determining whether his subsequent identifications were
credible.  Additionally, Officer Reese testified that appellant’s photo in the
array was “quite a bit different” than the “grainy” surveillance photos. 
Further, the surveillance and array photos were admitted at trial.  Thus, the
jury was allowed to personally evaluate the quality of the surveillance photos
when deciding whether Gunderson was influenced by them in making the subsequent
identifications. 

Appellant
also suggests that Gunderson’s identifications of appellant were unreliable
based on Gunderson’s age (sixty-one years old) at the time of the incident and
his physical and mental conditions precipitated by the robbery.  Again, the
jury was free to decide what weight, if any, to assign these factors when evaluating
the credibility of his identifications.

Appellant
further cites Gunderson’s testimony that the area between the vehicles where
appellant wielded the gun was dark and Gunderson focused more on the gun than
on the perpetrator.  However, Gunderson also explained that he saw appellant
approach in the parking lot because light from the store illuminated the area,
which was a handicapped-designated parking space only ten to fifteen feet from
the door.  Gunderson recognized appellant as he approached in the parking lot
because Gunderson had seen his face inside the store.

            Moreover, other
evidence corroborated certain portions of Gunderson’s testimony relative to the
identification issue.  Specifically, based on the aired surveillance footage, two
anonymous tipsters independently provided information that led Officer Reese to
appellant.  In addition, Hampton’s description of one assailant as a black male
wearing a blue shirt and khaki pants whom she had seen inside the store before
the robbery was consistent with Gunderson’s description of appellant to Officer
Alvarez immediately after the incident.  Finally, Hampton and Officer Alvarez both
testified the parking lot was well lit, and Officer Alvarez confirmed Gunderson
was parked in a handicapped parking place near the door.

            In sum, the
evidence is legally sufficient to support the jury’s finding that appellant
committed aggravated robbery.  We overrule his first and second issues.

III.  Assistance of Counsel

In his
third and fourth issues, appellant contends he received ineffective assistance
of counsel.  To prevail on an ineffective-assistance claim, an appellant must
prove (1) counsel’s representation fell below the objective standard of
reasonableness and (2) there is a reasonable probability that, but for
counsel’s deficiency, the result of the proceeding would have been different.  Strickland
v. Washington, 466 U.S. 668, 687, 694 (1984); Thompson v. State, 9
S.W.3d 808, 812 (Tex. Crim. App. 1999).  In considering an
ineffective-assistance claim, we indulge a strong presumption that counsel’s
actions fell within the wide range of reasonable professional behavior and were
motivated by sound trial strategy.  Strickland, 466 U.S. at 689; Thompson,
9 S.W.3d at 813; Jackson v. State, 877 S.W.2d 768, 771 (Tex. Crim. App.
1994).  To overcome this presumption, a claim of ineffective assistance must be
firmly demonstrated in the record.  Thompson, 9 S.W.3d at 814.  In most
cases, direct appeal is an inadequate vehicle for raising such a claim because
the record is generally undeveloped and cannot adequately reflect the motives
behind trial counsel’s actions.  Rylander v. State, 101 S.W.3d 107,
110–11 (Tex. Crim. App. 2003); Thompson, 9 S.W.3d at 813–14. When the
record is silent regarding trial counsel’s strategy, we will not find deficient
performance unless the challenged conduct was “so outrageous that no competent
attorney would have engaged in it.”  Goodspeed v. State, 187 S.W.3d 390,
392 (Tex. Crim. App. 2005).

Appellant
suggests his counsel’s performance was deficient in three respects:  (1)
failing to file a motion to suppress evidence concerning Gunderson’s identification
of appellant; (2) failing to investigate appellant’s alibi; and (3)
insufficiently cross-examining Yolanda Hampton.

A.        Motion to Suppress

Appellant
first complains that his counsel failed to file a motion to suppress evidence
regarding Gunderson’s identification of appellant on the ground it was tainted
by Gundersons’s viewing the surveillance photos shortly after the incident.  

Appellant
cites the law applicable to determining whether an in-court identification is
inadmissible because of a tainted pre-trial identification procedure.  A
due-process violation may occur if a suggestive pre-trial identification
procedure causes “a very substantial likelihood of irreparable
misidentification.”  Neil v. Biggers, 409 U.S. 188, 198 (1972); see
Webb v. State, 760 S.W.2d 263, 269 (Tex. Crim. App. 1988).  We perform a
two-step analysis to determine admissibility of an in-court identification.  Delk
v. State, 855 S.W.2d 700, 706 (Tex. Crim. App. 1993).  First, we inquire whether the
out-of-court identification procedure was impermissibly suggestive; and if so, we
determine whether the suggestive procedure gave rise to “a very substantial
likelihood of irreparable misidentification” at trial.  Id.  The appellant
bears the burden to establish the in-court identification is unreliable by
proving both of these elements by clear and convincing evidence.  See id.

Appellant suggests that counsel
should have moved to suppress any identification of appellant whether pre-trial
(in the surveillance photos and the photo array) or in-court because
Gunderson’s viewing the surveillance photos resulted in an
impermissibly-suggestive pre-trial identification procedure.  See Neil,
409 U.S. at 198 (stating that “very substantial likelihood of irreparable
misidentification” standard “serves equally well as a standard for the
admissibility of testimony concerning the out-of-court identification itself”).

To prevail on an
ineffective-assistance claim based on counsel’s failure to file a motion to
suppress, an appellant must show that such a motion would have been granted.  Jackson
v. State, 973 S.W.2d 954, 957 (Tex. Crim. App. 1998); see also Vaughn v. State,
931 S.W.2d 564, 566 (Tex. Crim. App. 1996) (stating that, before court will
sustain ineffective-assistance claim based on counsel’s failure to make
objection at trial, an appellant must show trial court would have erred by
overruling objection); Mooney
v. State, 817 S.W.2d 693, 698 (Tex. Crim. App. 1991) (recognizing, in
effective-assistance context, that counsel is not required to file futile
motions).

Appellant has not shown that the
trial court would have properly granted a motion to suppress.  In Jackson v.
State, 808 S.W.2d 570 (Tex. App.—Houston [14th Dist.] 1991, pet. ref’d),
our court addressed a substantially similar issue.  The complainant viewed the
surveillance-camera photo of a convenience-store robbery and verified that it
depicted the offense, including the two perpetrators.  Id. at 571.  The
complainant then viewed a standard photo array of six persons with similar
appearances and immediately identified the defendant as one of the robbers.  Id. 
During the array procedure, the officers exercised care to prevent any hint or
suggestion regarding which photo might be selected.  Id.  The trial
court denied the defendant’s motion to suppress testimony regarding the array
and in-court identifications.  Id.  At trial, the complainant testified
with “absolute certainty” regarding his immediate identification of the
defendant in the photo array and correctly identified the defendant in open
court based on his memory of the incident.  Id. at 572.  When affirming,
our court held that the pre-trial identification procedure was not impermissibly
suggestive.  Id. at 572­–73.

Our court acknowledged well-established
law holding that “a substantial likelihood of irreparable misidentification may
result where a suspect’s photograph is shown to a complaining witness
and is followed shortly thereafter by the complainant viewing a lineup or photo
array which displays that suspect in a suggestive fashion.”  Id.
at 572 (emphasis in original) (citing Neil,
409 U.S. at 199). 
The court further acknowledged the law holding that “the danger of irreparable
misidentification will be increased if the witness views only the
picture of a single individual who generally resembles the person he
saw, and the witness views a photo array that emphasizes the photo of the suspect
or the suspect’s picture reappears within the array.”  Id.
(emphasis in original) (citing Simmons
v. United States, 390 U.S. 377, 383 (1968);  Webb,
760 S.W.2d at 269).  However,
the court distinguished these scenarios from its case because the surveillance
photo at issue did not “display a suspect or someone resembling
appellant”; instead, the photo “display[ed] the actual perpetrators in
commission of the crime.”  Id. (emphasis in original).  The court further
emphasized that the defendant was recognized and named from the photo by
authorities and the photo was authenticated by the complainant who witnessed
the entire crime at close hand under satisfactory viewing conditions.  Id.

Likewise, Officer Reese did not show Gunderson
a random photo of a suspect or a person resembling appellant to
inquire whether it might depict the same person who committed the offense. 
Rather the surveillance photos depicted the actual perpetrator during
commission of part of the offense—his “casing” Gunderson inside the store. 
Accordingly, Gunderson merely verified that the photos depicted an event he personally
witnessed because he clearly observed appellant inside the store.  Indeed, Officer
Reese testified that he showed Gunderson the photos for “liability” purposes; he
wished to avoid incorrectly representing to the public that a person was a
criminal suspect when footage from the surveillance video aired on television,
and Gunderson was the only person who could verify that the photos showed the
perpetrator.  Similar to Jackson, Officer Reese then independently
ascertained appellant’s identity based on tipsters’ recognizing him in the
aired footage and obtained a different photo to use in the subsequent array.  Appellant
does not contend that the array procedure itself was suggestive; indeed,
appellant was one of six persons of similar appearance included in the array, and
Officer Reese did not inform Gunderson that the suspect was necessarily
included therein.  Finally, Gunderson made clear that his identifications of
appellant in the photo array and in court were based on his recollection of the
incident.  Accordingly, appellant could not have shown by clear and convincing
evidence that Gunderson’s viewing the surveillance photos created an
impermissibly-suggestive identification procedure.

In sum, because Gunderson’s viewing
the surveillance photos was not an impermissibly suggestive procedure, we need
not consider whether the procedure “created a substantial likelihood of
misidentification.”  See Webb, 760 S.W.2d at 269 (recognizing
that finding a pretrial identification procedure was not impermissibly suggestive
will obviate the need to assay whether it created “substantial likelihood of
misidentification”); Jackson, 808 S.W.2d at 572 (stating that, because challenged
identification procedure was not impermissibly suggestive, court need not
analyze whether it resulted in “substantial likelihood of misidentification”).

Consequently,
any motion to suppress Gunderson’s pre-trial and/or in-court identifications would
have lacked merit.  Rather, as we have discussed, Gunderson’s viewing the
surveillance photos was merely a factor for the jury to consider in evaluating
the credibility of his subsequent identifications, as opposed to a fact
negating admissibility of his identifications.  In fact, trial counsel
attempted to demonstrate, albeit unsuccessfully, via cross-examination that the
identifications were tainted on this basis.  Accordingly, counsel was not
ineffective by failing to file a motion to suppress.

B.        Appellant’s
Alibi

Appellant also argues that his trial counsel
was ineffective by failing to investigate appellant’s alibi.  In appellant’s
affidavit supporting his motion for new trial, he averred that counsel did not
investigate his alibi and the jury would have found reasonable doubt if counsel
had presented evidence regarding appellant’s “whereabouts” at the time of the
offense.  However, appellant’s general statement did not constitute conclusive proof
that counsel failed to investigate appellant’s alibi.  To support the motion
for new trial, appellant presented no testimony from counsel that he failed to
investigate any alibi.  We cannot foreclose the possibility that counsel did
pursue such an investigation and determined the alleged alibi was not
exculpatory.  Moreover, even if counsel failed to investigate the alleged
alibi, we cannot conclude he was ineffective because the record is silent on the
reason he did not pursue an investigation.  Finally, even if counsel failed to
investigate the alleged alibi, without any explanation from appellant regarding
the nature of the alibi, he has not proved the result of the trial would have
been different if counsel had pursued an investigation.

C.        Cross-examination of
Yolanda Hampton

Appellant also complains that counsel
did not aggressively cross-examine Hampton to prove she was unable to identify
appellant.  However, on direct examination, the State did not elicit testimony,
or attempt to prove, that Hampton could identify appellant, and she never
claimed that she was able to make such identification.  Therefore, counsel was
not ineffective by failing to cross-examine Hampton about any such
identification.  Accordingly, we overrule appellant’s third issue.

Finally, in his fourth issue, appellant
contends he received ineffective assistance based on the cumulative effect of
the alleged foregoing deficiencies.  We also overrule his fourth issue because he
has failed to demonstrate counsel was deficient in these respects. 

We affirm the trial court’s judgment.

 

 

                                                            


                                                            /s/        Charles
W. Seymore

                                                                                    Justice

 

 

Panel consists of Justices Anderson, Seymore,
and McCally.

 

Do Not Publish — Tex. R. App. P. 47.2(b).